# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**,

v.

**TAI TAN NGUYEN**,

Defendant.

Case No. 1:17-cr-00238 (TNM)

## MEMORANDUM ORDER

Tai Nguyen is charged with bulk cash smuggling, failure to file a currency report, and knowingly making false statements to government investigators. Ahead of his trial, Mr. Nguyen moved to suppress the statements he made to U.S. Immigration and Customs Enforcement ("ICE") agents during two interviews conducted in October 2016. Because these interviews were not custodial interrogations, and because his statements were made voluntarily, the Court denies the Defendant's motion.

## I.

The Government contends that Mr. Nguyen misused his position as an ICE Assistant Attaché to conceal, transport, and avoid reporting over $80,000 in cash in 2016. Def.'s Mot. to Suppress 2, ECF No. 7. Stationed at the U.S. Embassy in Bangkok at the time, Mr. Nguyen allegedly transported the money from Hawaii to Thailand and claimed diplomatic immunity to evade certain Bank Secrecy Act reporting requirements. *Id*.; Pl.'s Opp. to Def.'s Mot. to Suppress 2, ECF No. 8. Mr. Nguyen is also accused of knowingly making false statements to government agents in the subsequent investigation of the incident. *See* Indictment 2, ECF No. 1.

Special Agents Kendra Wynn and Michael Keck and Unit Chief Craig Larrabee worked in ICE's Office of Professional Responsibility ("OPR") in 2016. They interviewed Mr. Nguyen twice. Def.'s Mot. to Suppress 2. The first interview was conducted on October 27, 2016, at two locations in the District of Columbia – ICE headquarters and OPR's building in L'Enfant Plaza. *Id*. Mr. Nguyen requested the second interview. It was held the next day at the OPR building. Pl.'s Opp. to Def.'s Mot. to Suppress 2. Before each interview began, the ICE agents provided Mr. Nguyen several warnings and notices, including "a *Beckwith* Warning, Disclosure Warning, General Notice, and a Title 18 United States Code § 1001 Advisement." Def.'s Mot. to Suppress 2. Mr. Nguyen signed and dated each of the warnings and notices he received. *Id*. at 3.

Mr. Nguyen argues that these warnings were insufficient, as the interviews were "custodial in nature" and he was "interrogated." *Id*. (citing *Miranda v. Arizona*, 384 U.S. 436 (1966)). Therefore, because the ICE agents failed "to advise Mr. Nguyen of the full panoply of his *Miranda* rights – especially his right to have counsel present during the interviews – [they] denied him his Fifth Amendment privilege against self-incrimination." *Id*. at 3-4.

Mr. Nguyen also claims that the ICE agents "intimated" him "by using his position as an [ICE] 'employee' against him to coerce him into signing the waiver forms." *Id*. at 4. Because of this coercion, "his alleged waiver of his constitutional protections . . . was neither voluntary nor made with a full awareness" of the nature and scope of these protections. *Id*. Accordingly, the Defendant believes that his statements during the interviews "must be excluded from the government's case-in-chief at trial." *Id*. The Government disagrees, arguing that *Miranda* does not apply here, as Mr. Nguyen's "voluntary interview" was "not remotely custodial." Pl.'s Opp. to Def.'s Mot. to Suppress 3.

The parties submitted briefs presenting their arguments, which they summarized at a Motions Hearing. During the hearing, Agent Keck testified for the Government. As further detailed below, Agent Keck testified about the location, duration, and circumstances of the two interviews, describing his impressions of the questioning and Mr. Nguyen's demeanor.[1] Mr. Nguyen did not present any evidence or witnesses at the hearing.

## II.

The Fifth Amendment to the U.S. Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. At trial, the Government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure [this] privilege against self-incrimination." *Miranda*, 384 U.S. at 444. A custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id*. The procedural safeguards required include warning the interviewee that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id*.

The first step in a *Miranda* inquiry is to determine whether the questioning at issue was custodial. Custody is "a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508-09 (2012). This danger exists when, "in light of the objective circumstances of the interrogation, a reasonable

---

[1] The Court credits Agent Keck's testimony. Agent Keck provided candid responses, acknowledging that he did not know or remember certain details in response to the questions he was asked. The Defendant's cross-examination largely sought to clarify or amplify, rather than impeach, the substance of Agent Keck's testimony.

person would have felt he or she was not at liberty to terminate the interrogation and leave." *Id*. at 509 (cleaned up).  To evaluate the interviewee's perceived "freedom of movement," the Court considers "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning."  *Id*. (cleaned up).

Finding that an objective defendant would not feel free to terminate the interview does not end the inquiry, as "[n]ot all restraints on freedom of movement amount to custody for purposes of *Miranda*."  *Id*.  Rather, the Court must ask the "additional question [of] whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*."  *Id*.  In other words, the "freedom-of-movement test identifies only a necessary and not a sufficient condition" for custody.  *Id*. (citation omitted).

## III.

*Miranda* does not require that the Court exclude Mr. Nguyen's statements from his upcoming trial.  His interviews were non-custodial.  Moreover, he received multiple verbal and written warnings making it clear that answers to the agents' questions were optional.  These warnings, combined with his experience as a law enforcement official, further weigh against a finding that Mr. Nguyen was owed a *Miranda* warning.[2]

## A.

It would be highly implausible for a reasonable person in Mr. Nguyen's circumstances to conclude that he was "not at liberty to terminate the interrogation and leave."  *Howes*, 565 U.S.

---

[2] The parties agree that the relevant *Miranda* issue here is whether Mr. Nguyen was in custody.  *See* Hr'g Tr. 45:25-46:2.  Because the Court finds that that he was not, it need not determine whether the questioning can fairly be characterized as an "interrogation."

at 509.  As an initial matter, the second interview was initiated "*at the Defendant's own request.*" Pl.'s Opp. to Def.'s Mot. to Suppress 5 (emphasis in original).  Agent Keck testified that Mr. Nguyen "wanted to meet again to clarify some issues."  Hr'g Tr. 22:3-4.  The Defendant concedes that he "asked to meet with [the ICE agents] again after having had some sleep."  Def.'s Mot. to Suppress 9.  "[S]uspect-initiated contact" with law enforcement "is not custody for *Miranda* purposes."  *Schreane v. Ebbert*, 864 F.3d 446, 452 (6th Cir. 2017).  That Mr. Nguyen actively sought the interview thus indicates that he was not in custody during the second interview and is suggestive of the voluntary nature of the first.

Application of the *Howes* factors further demonstrates that Mr. Nguyen was not in custody for either interview.  Consider first the location of the questioning.  The October 27, 2016 interview began at ICE's headquarters.  Def.'s Mot. to Suppress 2.  There, Mr. Nguyen met with the ICE agents, who "walked with him to a conference room on a lower floor."  Pl.'s Opp. to Def.'s Mot. to Suppress 1.  The conference room "had windows, a conference table, and several chairs," and the door "was closed but unlocked."  *Id*.  Mr. Nguyen sat at the head of the table "in the chair closest to the door."  Hr'g Tr. 9:23-10:1.  In short, this professional setting was a far cry from the paradigmatic locked and windowless interrogation cell typically utilized for a stationhouse grilling.

After about an hour, the agents moved the interview to the nearby OPR building because "the conference room had only been reserved for basically an hour."  Hr'g Tr. 36:14-15.  The participants "walked a short distance" to the building, where they "sat in an office with a desk and chairs."  Pl.'s Opp. to Def.'s Mot. to Suppress 2.  The interview conducted the next day was also held in an office at the OPR building.  Hr'g Tr. 22:20-24.  It was in a "regular office" with

5

"windows . . . [and] a desk in there that would be equivalent to an employee's desk." Hr'g Tr. 23:23-24:5.

The Defendant contends that he had "limited exposure" to the "intimidating confines" of ICE buildings before the interviews. Def.'s Mot. to Suppress 7. But Mr. Nguyen was an ICE employee for over twenty years and, by his own admission, was "detailed to ICE headquarters for a short period in 2008." *Id.* at 2. The interviews were "not [at] a police station or any other characteristically police-dominated or coercive location, but w[ere] instead [at] office[s] inside of Defendant's own place of work." *United States v. Robinson*, 256 F. Supp. 3d 15, 26 (D.D.C. 2017). Because of Mr. Nguyen's familiarity with ICE's headquarters, and the fact that the interviews were held in a conference room and employee offices, the location of the questioning weighs against finding that he was in custody.

The questioning's duration does not suggest that Mr. Nguyen was in custody either. The first interview began at or around 11:02 a.m., "was paused for twenty minutes between noon and 12:20 p.m.," and finished at about 2:00 p.m. Def.'s Mot. to Suppress 7. The second interview "lasted less than one hour." Pl.'s Opp. to Def.'s Mot. to Suppress 5. While these interviews "were not short, they also were not unduly lengthy." *Holland v. Rivard*, 800 F.3d 224, 238-39 (6th Cir. 2015) (finding that a defendant "interviewed for approximately eight hours over the course of two days" was not in custody, as "he was not interviewed continuously," and "the interviews were conducted during normal waking hours."). *See also United States v. Killingsworth*, 118 Fed. Appx. 649, 651-52 (3d. Cir. 2004) (noting that "courts have found interrogations lasting anywhere from one and one-half to seven hours to be non-custodial," and citing several examples).

Verbal and written statements made by the participants confirm the interviews' non-custodial character.  Unit Chief Larrabee "advis[ed] the defendant prior to the start of the [first] interview that it was strictly voluntary, that he didn't have to answer any questions."  Hr'g Tr. 18:24-19:2.  He provided this warning "several times."  Hr'g Tr. 19:13-14.  Agent Keck, who was "new to OPR," believed that Chief Larrabee "went overboard to advise the defendant that it was strictly voluntary."  Indeed, he feared that the warnings might "push [Mr. Nguyen] away" rather than induce him to "cooperate and talk."  Hr'g Tr. 19:21-20:3.  This powerfully contradicts Mr. Nguyen's claims of custody and coercion.

The agents supplemented the verbal advice with written warnings before each interview:

- Mr. Nguyen read and signed a "General Notice," which stated that the agents were "investigating the alleged Bank Secrecy Act violation that you engaged in when you removed over $80,000 USD from the U.S. without declaring it."  Def.'s Mot. to Suppress, Ex. B at 3, ECF No. 7-3.  The Notice told Mr. Nguyen that the "interview is related to possible criminal misconduct by you."  *Id*.  Mr. Nguyen signed his initials on the Notice.  *Id*.

- Mr. Nguyen also read and signed a piece of paper detailing "Warnings and Assurances to Employee Requested to Provide Information on a Voluntary Basis."  *Id*. at 5.  The document said, "This is a voluntary interview.  Accordingly, you do not have to answer questions.  No disciplinary action will be taken against you solely for refusing to answer questions."  *Id*.  Mr. Nguyen signed both the "General Notice" and the "Warnings and Assurances" twice.

- During the second interview  Mr. Nguyen read and signed a "Consent to Search" form that authorized Agent Wynn to search a "government issued cell phone and related media."  *Id*.

at 10. By signing the form, Mr. Nguyen acknowledged that he was consenting "solely because of [his] desire to freely and voluntarily cooperate and assist in this investigation." *Id*. He also acknowledged that he had "not been promised anything or been threatened or coerced in any way." *Id*.

By signing these documents, Mr. Nguyen repeatedly indicated that he was acting voluntarily and with a full understanding of the legal peril that loomed in front of him. His current complaints of his own ignorance and his interlocutors' trickery and coercion ring hollow.

More still, Mr. Nguyen was not physically restrained during his questioning, and the interviews ended when "the defendant had nothing else to say or talk about." Hr'g Tr. 29:16-18. There is no evidence that Mr. Nguyen was not free to leave at any time during the interviews, and indeed he left on his own after each interview. *See United States v. Galceran*, 301 F.3d 927, 931 (8th Cir. 2002) (stating that the lack of arrest was a "very important factor weighing against custody").

True, the agents were armed. *See* Hr'g Tr. 10:15-16. But as Mr. Nguyen surely understood, it was "[a]bsolutely" normal for an ICE agent to be armed while at work. Hr'g Tr. 10:17-18. The weapons remained concealed under the agents' business attire throughout the interviews. Hr'g Tr. 11:5-20; 25:13-20. The mere fact that agents are armed does not alone create the type of coercive environment that *Miranda* contemplates. *See, e.g.*, *Berkemer v. McCarthy*, 468 U.S. 420, 438 (1984) ("To be sure, the aura of authority surrounding an armed, uniformed officer . . . exert[s] some pressure on the detainee to respond to questions. But other aspects of the situation substantially offset these forces."). Holstered weapons—especially when concealed—add little to the custody analysis. This is especially true when the suspect himself is a law enforcement officer, accustomed to interacting with armed colleagues. *Cf. United States v.*

8

*LeBrun*, 363 F.3d 715, 723 (8th Cir. 2994) (en banc) (noting that the defendant's experience and dealings with law enforcement weighed against a finding of custody).

In short, none of the *Howes* factors—the location and duration of the questioning, statements made during the interview, the presence or absence of physical restraints, or the interviewee's release at the end of questioning—weigh in favor of a finding that Mr. Nguyen was in custody when he made the statements he now seeks to suppress. The Defendant's attempts to suggest otherwise by portraying an "intimidating," "disorienting," and "coercive" questioning environment are unpersuasive. *See* Def.'s Mot. to Suppress 7-9. Because Mr. Nguyen's freedom of movement was not curtailed, the Court need not also consider whether his environment presented the "same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes*, 565 U.S. at 509.

## B.

Mr. Nguyen raises two arguments attempting to show both that he was in custody and that the statements he made during the interviews were involuntary. While "patently voluntary statements taken in violation of *Miranda* must be excluded from the prosecution's case," they can still be used for impeachment purposes on cross-examination. *Oregon v. Elstad*, 470 U.S. 298, 307 (1985). But statements that "are, in very fact, involuntary" are not admissible for any purpose. *United States v. Mohammed*, 693 F.3d 192, 198 (D.C. Cir. 2012). "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *LeBrun*, 363 F.3d at 724 (quoting *Simmons v. Bowersox*, 235 F.3d 1124, 1132 (8th Cir. 2001)). Both of Mr. Nguyen's arguments are unavailing, and his statements are therefore admissible.

*First*, Mr. Nguyen contends that ICE tricked him into participating in the interviews. He alleges that, "en route from his duty station in Bangkok, Thailand to his new duty station in the Dallas area," ICE "re-routed him to Washington, D.C., ostensibly to accept an award." Def.'s Mot. to Suppress at 6. The initial interview was conducted following a "hurriedly put together award ceremony," and Mr. Nguyen "was not advised of the interview prior to traveling to Washington, D.C." *Id*.

While the Defendant offered no evidence to support these contentions, they do not, even if true, suggest that he was in custody. Nor do they represent "the egregious facts necessary to establish that the statements he made during questioning were involuntary." *Mohammed*, 693 F.3d at 198; *see also LeBrun*, 363 F.3d at 718, 724-25 (holding that the use of psychological ploys did not make a statement involuntary). Before being interviewed, Mr. Nguyen read and signed forms notifying him that the ICE agents planned to ask him questions about his alleged criminal conduct. He was aware that he was being asked to voluntarily cooperate in an ongoing investigation. And, armed with that awareness, Mr. Nguyen did not decline to answer questions or seek to end the interview. *See* Hr'g Tr. 13:20-14:12; 20:4-16. In fact, he asked the investigators for a second interview. Hr'g Tr. 44:11-15.

A cursory comparison of Mr. Nguyen's interview circumstances to those producing truly involuntary statements demonstrates his argument's shortcomings. In *Mincey v. Arizona*, a suspect was determined to have made involuntary statements during questioning because he "had been seriously wounded just a few hours earlier," was "lying on his back on a hospital bed," and was in a "debilitated and helpless condition." 437 U.S. 385, 398-99 (1978). In *Beecher v. Alabama*, the suspect made involuntary statements when he was "ordered [by investigators] at gunpoint to speak his guilt or be killed." 389 U.S. 35, 38 (1967). Here, by contrast, there is

10

simply no reason to doubt that Mr. Nguyen "was treated well during his relatively brief interrogation[s], and that he seemed eager to talk" to the ICE agents. *Mohammed*, 639 F. 3d at 198.

*Second*, Mr. Nguyen suggests that he was "interrogated without rest, after having arrived in Washington, D.C. following a 20-hour flight from Thailand," and that the ICE agents "took advantage of [his] 'employee' status by intimidating him with the very language of the consent forms." Def.'s Mot. to Suppress 11. These forms, he contends, featured "language which clearly threatened his employment." *Id*.

The evidence belies his arguments. When Agent Keck encountered him, Mr. Nguyen "seemed to be well engaged and quite frankly, seemed to be in a good mood." Hr'g Tr. 33:5-7. The tone of the interviews was "very professional on both sides," there "seemed to be a free flow of information," and "everybody seemed to be very professional and engaged each other in conversation." Hr'g Tr. 20:13-16. The second interview was "very cordial," and there was "no shouting or screaming." Hr'g Tr. 29:14-15. This unrebutted evidence of a low-key, professional discussion strongly undercuts Mr. Nguyen's allegations as to both the custodial nature of the meetings and the voluntariness of his responses. And the forms that Mr. Nguyen signed twice stated that "No disciplinary action will be taken against you solely for refusing to answer questions." Def.'s Mot. to Suppress, Ex. B at 5.

If anything, Mr. Nguyen's status as an ICE employee further distances this case from any Fifth Amendment violation. The custody inquiry requires the Court to ask whether, "given [the] circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 113 (1995). In other words,

11

would "a reasonable person in the *defendant's position*" consider himself to be in custody? *LeBrun*, 363 F. 3d at 723 (emphasis in original).

Mr. Nguyen's "past experience and dealings" with ICE suggest he understood that his participation in the interviews was voluntary. *Id*. It is highly unlikely that, with over twenty years of experience as a federal law enforcement official, Mr. Nguyen was unfamiliar with the process of questioning suspects and the *Miranda* rights accorded to these suspects during custodial interrogations. *See United States v. Zahrey*, 963 F. Supp. 1273, 1278-79 (E.D.N.Y. 1997) (finding that a former police officer was not in custody, in part because he "undoubtedly was familiar with police questioning and was aware of the *Miranda* rights, having gained that knowledge from his eleven years of employment on the police force."). Mr. Nguyen came to the interviews armed with a knowledge of his rights and law enforcement techniques that few criminal suspects could match. And he was accorded professional courtesies that most suspects will never receive. The record here does not begin to make out a *Miranda* violation, much less evidence of an involuntary statement.

The Court finds that Mr. Nguyen was not in custody during the two interviews conducted on October 27 and 28, 2016. He was free to leave, spoke to the ICE agents voluntarily, and was provided ample opportunity, through verbal and written warnings, to consider the consequences of his decision to participate. Accordingly, the agents were not required to provide Mr. Nguyen with a *Miranda* warning, and the statements he made will not be suppressed.

## IV.

For the foregoing reasons, the Defendant's Motion to Suppress Statements is hereby DENIED.

**SO ORDERED**

Dated: September 18, 2018                               TREVOR N. MCFADDEN, U.S.D.J.